# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

BUILD BAYTOWN I, LLC

        Debtor

BUILD BAYTOWN I, LLC

        Plaintiff

        v.

THE CITY OF BAYTOWN

        Defendant

Case No. 3:24-bk-30748-SHB
Chapter 7

Adv. Proc. No. 3:24-ap-03029-SHB

## M E M O R A N D U M

**APPEARANCES:**    LAPIN & LANDA, LLP
    Robert E. Lapin, Esq.
    500 Jefferson
    Suite 2000
    Houston, Texas 77002-7371
    Attorneys for Plaintiff, Build Baytown I, LLC

    HUSCH & BLACKWELL LLP
    Ryan A. Burgett, Esq.
    736 Georgia Avenue
    Suite 300
    Chattanooga, Tennessee 37402

    Lynn Hamilton Butler, Esq.
    111 Congress Avenue
    Suite 1400
    Austin, Texas 78701
    Attorneys for Defendant, The City of Baytown

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding was commenced by the filing of the Original Complaint and Request for Declaratory Relief ("Complaint") on November 20, 2024 [Doc. 1].  Before the Court is Defendant's Motion to Dismiss ("Dismissal Motion") and supporting brief ("City's Brief") filed on December 23, 2024 [Docs. 9, 10], asking the Court to dismiss this adversary proceeding. Defendant, the City of Baytown,[1] argues that Plaintiff[2] has failed to allege facts showing that the City waived its governmental immunity or that Plaintiff is entitled to its requested relief so that the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and/or Rule 12(b)(6) for failure to state a claim on which relief can be granted.  Plaintiff filed its response brief ("Response") on January 10, 2025 [Doc. 19], arguing that the Dismissal Motion should be denied because the Complaint properly states claims for relief under all causes of action and, based on Defendant's proprietary actions, governmental immunity does not apply to bar Plaintiff's causes of action or to prevent the Court from assessing liability against Defendant under Texas law. [*Id.*]  As authorized by E.D. Tenn. LBR 7007-1(a), the City timely filed a Reply on January 15, 2025 [Doc. 20].

The bankruptcy case was converted from Chapter 11 to Chapter 7 on May 7, 2025.  John P. Newton, Jr., who was appointed as Chapter 7 Trustee, filed a Notice of his intention to pursue this adversary proceeding on July 29, 2025 [Doc. 24], and the parties advised the Court at the status conference held July 31, 2025, that they did not intend to supplement the Dismissal Motion, Response, or Reply.[3]

---

[1] The City of Baytown will be referred to hereinafter as "Defendant" or the "City."

[2] Build Baytown I, LLC, will be referred to hereinafter as "Plaintiff" or "BBI."

[3] Because the matter was fully briefed before conversion and Mr. Newton's intervention in the case as Chapter 7 Trustee, for purposes of this memorandum, the plaintiff in this action remains Build Baytown I, LLC.  Moving forward in this adversary proceeding, however, the Chapter 7 Trustee must be substituted as the plaintiff.

## I. BACKGROUND FACTS[4]

BBI is a limited liability company organized under Texas law, and Defendant is a municipality located in Texas. [Stip. Facts at ¶¶ 2-3.]  The parties entered into a Chapter 380 Program Agreement for Economic Development Incentives ("380 Agreement") on March 18, 2022, under which the City provided BBI with a $6,000,000.00 grant plus the costs of certain bonds (not to exceed $80,000.00) and a waiver of project-related fees for BBI to develop and operate a public golf course and related amenities as specified in the Lease Agreement ("Lease") executed by the parties on April 20, 2022. [Doc. 1 at ¶ 11; Doc. 1-1; Doc. 9 at ¶¶ 3-4; Stip. Facts at ¶¶ 15-18.]  In the Lease, BBI agreed "to use and occupy the Property only for (a) a public golf course and (b) . . . golf-related retail purposes" for a term of 480 months. [Doc. 1-2; Doc. 9 at ¶¶ 3, 5; *see also* Stip. Facts at ¶¶ 15, 18-19.]  BBI leased "just over 105 acres comprised of the site of the City's former Evergreen municipal golf course plus approximately 12.5 acres of adjoining property for the purpose of developing and operating a public golf course as well as other golf-related amenities and retail businesses." [Doc. 1-1 at ¶ 11.]  The Lease also "authorized cash incentive payments for qualified project costs associated with BBI's development of this project[] and . . . granted BBI a contingent option to lease an additional 8.5 acres at the northern end of the property for commercial, hospitality or multi-family residential property development." [*Id.*]

---

[4] In addition to the facts stated in the Complaint, the Court detailed the parties' relationship in its Memorandum and Order entered on November 21, 2024, which resolved the City's motion to transfer venue in the underlying bankruptcy case. [Case No. 3:24-bk-30748-SHB, ECF No. 118.]  As authorized by Federal Rule of Evidence 201, to the extent that it provides the Court additional background in connection with this adversary proceeding, the Court takes judicial notice of the parties' Stipulation of Undisputed Facts filed in connection with the motion to transfer venue. [*See* Case No. 3:24-bk-30748-SHB, ECF No. 100 at 2-5.]  All references to the Stipulation of Undisputed Facts will be "Stip. Facts at ¶ _" without further reference to the citation from the bankruptcy case.

BBI alleges the following additional facts in its Complaint:

12. The Chapter 380 Agreement and the Lease Agreement envisioned BBI and its affiliate entities not simply redeveloping a golf course but, instead, creating a true community-gathering experience for the citizens of the City of Baytown and beyond which would serve as a catalyst for the kind of commercial development growth envisioned by the City's leadership. Toward that end, BBI associated one of the country's top golf architects to design a golf course which incorporated the unique, patent-pending double loop "T-36" golf course design created by BBI's principals which resulted in a United States Golf Associated-rated 18-hole golf course which utilized half the acreage required by traditional golf course designs, making the course more environmentally-friendly and thereby unlocking the remaining acreage for further commercial, hospitality or multi-family residential development.

13. Pursuant to the Chapter 380 Agreement and Lease Agreement, BBI was granted a 40-year lease of the property and BBI's *pro forma* projections anticipated that golf and related operations at the T36 at Baytown course would experience the expected "ramp up" performance but would begin to turn a profit just 2-3 years into the 40-year lease term. Moreover, by early-2024, BBI affiliates had worked with architects to develop site plans for commercial development of the remaining acreage which had generated interest from hotel operators and others which portended a bright and successful future for the project.

14. On or about May 1, 2023, BBI's affiliate, T36 Golf Holdings, LLC ("T36") entered into a Golf Facility Management Agreement ("the Management Agreement") with Troon Golf, L.L.C. ("Troon"), the world's largest golf and golf-related hospitality company, pursuant to which, in return for the payment of management fees, payroll reimbursement, and expenses, Troon agreed to provide operational and facility management of the golf course.

15. Notwithstanding BBI having overcome some costly delays and significant challenges presented by several vendors and by the City, on December 13, 2023, BBI opened the golf course under the name "T36 at Baytown" to rave reviews from the City's leadership and others.

. . . .

18. The City not only acknowledged BBI's role in successfully furthering the City's economic development, it expanded BBI's role when, in February of 2024, the Baytown City Council voted 7-0 to proceed forward with Project Vector - a strategic initiative designed to unlock the untapped potential of the City's south side by creating a hotel and a mixed-use project on land adjacent to the golf course - all with BBI as the developer of these tracts of land.

. . . .

21. BBI did not look to or request from the City any of the additional funding needed and, instead, pursued an avenue granted to BBI under the Lease Agreement; namely, seeking the necessary bridge funding from an entity which would qualify as a "Tenant Affiliate" under §10.1.2 of the Lease Agreement. Pursuant to §§ 10.1.1 and 10.1.2 of the Lease Agreement, BBI was permitted to transfer part of BBI's leasehold interest in the property to a qualifying Tenant Affiliate with notice to the City in which case, in the event the City's consent to the transfer was required, the City had obligated itself in the Lease Agreement not to unreasonably withhold its consent.

[Doc. 1 at 4-6; *see also* Stip. Facts at ¶¶ 18-19, 23, 26-27.]  Improvements to the property included a 17,800 square foot newly renovated clubhouse, a 5,000 square foot golf-cart storage facility, and a 5,000 square foot maintenance facility. [Stip. Facts at ¶ 24.]

On April 2, 2024, the City provided BBI with a notice of default, demanding that BBI produce information regarding its operations, outstanding projects at the golf course, and outstanding debts and requesting documentation concerning the golf course and an accounting of its use of the $6,000,000.00 grant. [*Id.* at ¶ 29.]

## II. DISCUSSION

Under Federal Rule of Civil Procedure 12, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012, "a party may assert the following defenses by motion:  (1) lack of subject-matter jurisdiction . . . [and] (6) failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b).

### A.  **Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)**

Rule 12(b)(1) requires dismissal of a complaint for a "lack of subject-matter jurisdiction," which must be decided first because "the Rule 12(b)(6) challenge becomes moot if this [C]ourt lacks subject matter jurisdiction." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).  When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden to prove jurisdiction to survive the motion. *Arnold v. Moore & Smith*

*Tree Care LLC*, No. 25-5221, 2025 WL 3483272, at *2 (6th Cir. Oct. 6, 2025).  Motions to dismiss under Rule 12(b)(1) are based on either facial attacks related to the sufficiency of the allegations or factual attacks under which there is no presumption of truthfulness applied to the allegations. *L.C. v. United States*, 83 F.4th 534, 542 (6th Cir. 2023).

A facial attack addresses whether the complaint alleges a basis for subject matter jurisdiction but does not challenge the facts alleged, requiring the court to accept the factual allegations as true. *Id*.  Facial attacks, therefore, are subject to the plausibility test set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See Morgeson v. Freeman*, No. 1:23-cv-269, 2024 WL 1406105, at *5 n.6 (S.D. Ohio Apr. 2, 2024 ("The Court acknowledges that *Iqbal* and *Twombly* are Rule 12(b)(6) cases, not Rule 12(b)(1) cases assessing facial challenges to the Court's subject-matter jurisdiction. But they provide the contours for deciding what constitute the 'reasonable inferences' to which a complaint's well-pleaded allegations give rise. And that inquiry parallels the question the Court must decide in assessing its subject-matter jurisdiction from the face of the complaint." (citations omitted)); *cf. Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543-44 (6th Cir. 2021) (joining other circuits that apply the plausibility test to standing issues).

Factual attacks, on the other hand, "'challenge[] the factual existence of subject matter jurisdiction' . . . [and] 'attack[] the factual allegations underlying the assertion of jurisdiction, either through the filing of an answer or otherwise presenting competing facts.'" *L.C.*, 83 F.4th at 542 (citations omitted). Further,

> [w]hen adjudicating "a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case."

*Id*. (quoting *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014)).  An attack based on an

assertion of sovereign immunity can be either facial or factual. *See L.C.*, 83 F.4th at 542.

The City expressly couches its Rule 12(b)(1) argument as a facial attack against the

jurisdictional allegations of the Complaint concerning the City's immunity. [*See* Doc. 10 at ¶ 8

(acknowledging that the Court must take the allegations of the Complaint as true in its Rule

12(b)(1) analysis).]  It asserts: "Plaintiff fails to allege facts showing the City waived its

governmental immunity as to the claims asserted in the complaint or to the damages requested"

[Doc. 9 at ¶ 2], and "the Court's lack of subject-matter jurisdiction is evident from the face of the

pleadings and the exhibits incorporated into that pleading." [Doc. 10 at ¶ 9.]  More specifically,

the City argues:

> Plaintiff fails to adequately plead factual allegations indicating the City's immunity
> is waived for the full extent of Plaintiff's claims.  The City acted in a governmental
> capacity by contracting with Plaintiff to perform what Texas statutory and common
> law expressly deem a governmental function – namely, operating recreational
> facilities. Plaintiff's claims for fraud and unjust enrichment are inadequately pled,
> and claims for which no waiver of immunity exists under Texas law. Finally, even
> to the extent a waiver of the City's immunity from suit could be identified, Plaintiff
> has failed to state any claim for which the City's immunity from liability is waived.

[*Id.* at ¶ 3[5] (citation omitted).]

In summary, the City argues that the Complaint should be dismissed under Rule 12(b)(1)

because it, "as a governmental entity, is immune from both suit and liability for such claims [as

breach of contract, common-law fraud, unjust enrichment, and declaratory relief,]" and it has not

waived its immunity. [*Id.*at ¶ 12.]  The City asserts that it is protected by immunity from suit for

breach of contract because it acted in its governmental, not proprietary, capacity when it entered

into the 380 Agreement.  The City also asserts that it is immune from suit for intentional torts

under the Texas Tort Claims Act ("TTCA") and that it, likewise, is immune from suit under the

---

[5] The City's brief contains two paragraphs numbered 3.

equitable theory of unjust enrichment and the Uniform Declaratory Judgement Act as codified in Texas.  Finally, the City asserts immunity from contract liability under the Texas Local Government Code section 271.152.

In opposition, BBI argues that the City wrongly focused on *waiver* of sovereign immunity rather than its *applicability* and that Texas law has clearly established that immunity does not apply to cities acting in a proprietary rather than governmental capacity. [Doc. 19 at ¶¶ 14-31.]  In support of its argument, Plaintiff relies on *League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494 (Tex. 2023), in which the Texas Supreme Court directed courts to apply four factors to analyze immunity in deciding whether a municipality was acting in a governmental or proprietary capacity when it entered into a contract.  Although the City asserted in its Reply that "Plaintiff places excessive reliance on its misinterpretation of [*Jimmy Changas*]," [Doc. 20 at ¶ 10], the City failed to address the factors.  This Court, however, deems application of the factors provided by the Texas Supreme Court to be dispositive of much of the Dismissal Motion.

As an initial matter, to "'shield the public from the costs and consequences of improvident actions of their governments,' sovereign immunity generally bars claims against the State and its agencies." *Jimmy Changas, Inc.*, 670 S.W.3d at 498-99.  "Governmental immunity encompasses the following two principles: (1) immunity from suit, which precludes a lawsuit against the entity unless the Legislature has expressly consented to the suit, and (2) immunity from liability, which precludes a judgment against the government even if the Legislature has expressly consented to the suit." *City of Friendswood v. Horn*, 489 S.W.3d 515, 522 (Tex. App. 2016) (citing *City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011)).  "If a governmental entity is engaged in a proprietary function, immunity is *unavailable*; the governmental entity may be sued and can be held liable *to the same extent as a private entity or individual*." *Id*. at

523 (emphases added).  This is true for any type of claim, as explained by the Texas Supreme

Court in *Wasson Interests, Ltd. v. City of Jacksonville* (*Wasson I*), 489 S.W.3d 427, 434 (Tex.

2016):  "[A]cts performed as part of a city's proprietary function do not implicate the state's

immunity for the simple reason that they are not performed under the authority, or for the

benefit, of the sovereign."  Accordingly, treatment for cities and municipalities varies, depending

on whether the governmental entity was acting in a governmental or a proprietary capacity.

> Municipal corporations often function in a governmental capacity on the State's
> behalf but at other times function as "a private corporation," *City of Tyler v. Ingram*,
> 139 Tex. 600, 164 S.W.2d 516, 519 (1942), "for the private advantage and benefit
> of the locality and its inhabitants." *Wasson I*, 489 S.W.3d at 433. Because
> "sovereign immunity is inherent in the State's sovereignty," municipalities "share
> that protection when they act 'as a branch' of the State but not when they act 'in a
> proprietary, non-governmental capacity.'" *Wasson Ints., Ltd. v. City of Jacksonville*
> (*Wasson II*), 559 S.W.3d 142, 146 (Tex. 2018) (quoting *Wasson I*, 489 S.W.3d at
> 430).

*Jimmy Changas*, 670 S.W.3d at 499.

Under long-standing Texas law, "[a] municipality is not immune from suit for torts

committed in performance of its proprietary functions." *Wasson II*, 559 S.W.3d at 145 (quoting

*Wasson I*, 489 S.W.3d at 433).  A municipality is immune from suit, however, "for torts

committed in the performance of its governmental functions." *Id.* (quoting *Wasson I*, 489 S.W.3d

at 433)).  The same is true for contracts or, indeed, for any type of claim:  "If [a court]

determine[s] the action arose out of the municipality's performance of a proprietary function,

then the case proceeds as if the claim were asserted against a private person." *Wheelabrator Air

Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 451 (Tex. 2016) (citing *Wasson

I*, 489 S.W.3d at 431).  The question the Court must answer is whether the City "was engaged in

a governmental or proprietary function when it entered into the [380 Agreement], not when it

allegedly breached that contract." *Wasson II*, 559 S.W.3d at 149.

Concerning the governmental-proprietary dichotomy, the Texas Supreme Court directed that "[i]f a particular activity is not included in the statutory list of governmental functions, [courts] look to the general definitions under both the common law and the statute . . . , consider[ing] . . . four factors." *Jimmy Changas*, 670 S.W.3d at 500. Thus, central to both immunity from suit and from liability for any type of claim is whether the City was acting in its governmental or proprietary capacity, and the Texas Supreme Court's recent analysis of that issue in *Jimmy Changas* governs the issues raised in the Dismissal Motion.

In *Jimmy Changas*, the Texas Supreme Court was asked to determine whether the trial and appellate courts correctly decided that League City was acting in a proprietary capacity when it entered into a chapter 380 agreement with Jimmy Changas, Inc. for the construction of a restaurant in exchange for the city's reimbursement of "capital-recovery fees for water and wastewater services, all fees Jimmy Changas would pay to obtain plat approvals and building permits, and a percentage of Jimmy Changas's local-sales-tax payments based on the restaurant's total annual sales." *Jimmy Changas*, 670 S.W.3d at 498. The chapter 380 agreement with League City

> recited that its purposes were "to promote state or local economic development and to stimulate business and commercial activity in the City," to "contribute to the economic development of the City by generating employment and other economic benefits to the City," and to encourage Jimmy Changas to develop the property "in a manner that establishes the area as a regional destination."

*Id.*[6] In evaluating the agreement, the court examined the differences between the types of functions that a municipality would perform, i.e., proprietary functions or governmental functions.

---

[6] Under Texas law, which governs the parties' 380 Agreement, the purpose of a chapter 380 agreement is to allow "cities to provide 'economic development' incentives 'to promote state or local economic development and to stimulate business and commercial activity in the municipality.'" *Jimmy Changas*, 670 S.W.3d at 498 (quoting Tex. Loc. Gov't Code § 380.001(a)).

Under the common law, proprietary functions are those that a city performs in its discretion primarily for the benefit of those within the corporate limits of the municipality, and not as an arm of the government or a branch of the state or under the authority, or for the benefit, of the sovereign. Proprietary functions can be, and often are, provided by private persons.

Governmental functions under the common law are those that involve the performance of purely governmental matters solely for the public benefit, are normally performed by governmental units, and are performed as a branch of the state – such as when a city exercises powers conferred on it for purposes essentially public pertaining to the administration of general laws made to enforce the general policy of the state.

. . . .

The Texas Constitution specifically authorizes the legislature to define governmental and proprietary functions for all purposes. Exercising this authority, the legislature has addressed the dichotomy for purposes of tort claims but not for claims for breach of contract. Generally consistent with the common-law descriptions, the Tort Claims Act defines proprietary functions as those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality. Statutorily, proprietary functions include, but are not limited to, the operation and maintenance of a public utility, amusements owned and operated by the municipality, and any activity that is abnormally dangerous or ultrahazardous.

By contrast, the Act defines governmental functions as those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public. In addition to this general definition, the Act includes a non-exclusive list designating thirty-six specific activities as governmental functions, ranging from police and fire protection and control to animal control.

*Id.* at 499–500 (citation modified).

Recognizing that the "statutory definitions and designations apply expressly to tort claims," the Texas Supreme Court reiterated that such definitions and designations "can also 'aid [an] inquiry' when applying the dichotomy in the contract-claims context." *Id.* at 500 (quoting *Wasson II*, 559 S.W.3d at 147-48).  Thus, if a city's activity is not enumerated in the statutory list detailing governmental functions, the courts must "look to the general definitions to determine whether the activity is 'governmental' or 'proprietary.' Particularly in breach-of-

contract cases, [the courts] consider 'both the statutory provisions and the common law in determining whether a city's contractual conduct is governmental or proprietary.'" *Id*. at 503 (quoting *Wesson II*, 559 S.W.3d at 150, 148).

After looking to "the general definitions under both the common law and the statute," the Texas Supreme Court espoused the following factors to be considered by courts when discerning whether a city's conduct is proprietary or governmental:

> (1) whether the city's act of entering into the contract was mandatory or discretionary, (2) whether the contract was intended to benefit the general public or the city's residents, (3) whether the city was acting on the State's behalf or its own behalf when it entered the contract, and (4) whether the city's act of entering into the contract was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.

*Id*. at 500 (citing *Wasson II*, 559 S.W.3d at 150).

In opposition to the Dismissal Motion, BBI argued that it sufficiently pleaded facts in the Complaint to satisfy the *Jimmy Changas* factors for its claims.  Specifically, Plaintiff argued that the City's decision to enter into the 380 Agreement (and the associated Lease) was discretionary, not mandatory; that the City entered into the 380 Agreement primarily for its own citizens; that the City was acting on its own behalf and not that of the State of Texas when it entered into the 380 Agreement, and that the City's entering into the 380 Agreement was not related to any governmental function. [*See* Doc. 19 at ¶¶ 24a.-d.]

Notably, the City did not address the *Jimmy Changas* factors in its opening brief. [*See* Doc. 10.]  Instead, it discussed the decision generally with respect to the Texas Supreme Court's statement that the definitions for a municipality's functions under the TTCA are the starting point for any immunity analysis. [*Id*. at ¶ 17.]  It also cited *Jimmy Changas* for the proposition that economic development activities underlying a chapter 380 agreement do not compel a finding that a municipality has acted in a proprietary capacity, asserting that the *Jimmy Changas*

court noted that chapter 380 agreements may "embrace 'many different municipal functions that may otherwise be considered governmental.'" [*Id.* at ¶ 22 (quoting *Jimmy Changas, Inc.*, 670 S.W.3d at 502 n.4).]

For its main argument that BBI failed to allege that the City waived its immunity, the City relied on a decision from the Texas Court of Appeals predating *Jimmy Changas* by approximately fourteen years. [*Id.* at ¶ 15 (citing *City of Plano v. Homoky*, 294 S.W.3d 809 (Tex. App. 2009)).]  In *Homoky*, a golfer who was injured while walking through the clubhouse sued the city, which owned and operated the golf course, including the bar and grill located inside the clubhouse.  *See Homoky*, 294 S.W.3d. at 811. The suit sounded in tort, not contract, under a theory of premises liability.  *See id.*  Noting that the golf course was in a city-owned park, the court acknowledged that "golf course" is not listed as a governmental function in the TTCA. *Id.* at 814 (citing Tex. Civ. Prac. & Rem. Code § 101.0215(a)).  The court of appeals then analyzed the statutory terms "parks and zoos" and "recreational facilities, including but not limited to swimming pools, beaches, and marinas" and the broad construction of such terms by Texas courts, including a 1960 case, *State v. Merrill*, 334 S.W.2d 423 (Tex. 1960). *Id.* at 814.

In *Merrill,* the Texas Supreme Court reviewed whether "park purposes" in a lease of property to the state included the "privilege of horseback riding" in a state park such that the state was obligated to promulgate rules and regulations governing horseback riding to ensure protection of the lessor's grazing rights in the land. *See id.* at 434-35.  As part of the discussion about "park purposes," the court cited a 1936 *Iowa* case for the following proposition:  "'It is a matter of common knowledge that 'parks' are used by the public generally for recreation through many different games, such as tennis, pitching horse shoes, croquet, baseball, basketball, *golf,*

walking horseback riding, picknicking [*sic*], and general outdoor exercise.'" *Id.* at 434 (emphasis added) (quoting *Golf View Realty Co. v. Sioux City*, 269 N.W. 451, 455 (Iowa 1936)).

The *Homoky* court concluded that a "municipal golf course offers the same purposes described [in *Merrill*], including activities 'associated with enjoying nature or the outdoors.'" *Homoky*, 294 S.W.3d at 814 (quoting Tex. Civ. Prac. & Rem. Code § 75.001(3)(L)[7]). Notwithstanding that operating a golf course is not expressly identified in the TTCA as a governmental function, the City summarily concluded that the City performed a governmental function when it contracted with Plaintiff.  [Doc. 10 at ¶ 15 (citing *Homoky*, 294 S.W.3d at 814-15).]

Given the distinctions between the golf course in a public park (i.e., city-operated) and the claim at issue (i.e., premises liability) in *Homoky* versus here, the Court finds that *Homoky* is distinguishable.  Moreover, given the Texas Supreme Court's recent directive that the TTCA "classifications merely serve as 'guidance in the contract-claims context,'" *Jimmy* Changas, 670 S.W.3d at 502, and that the proprietary-governmental dichotomy must be viewed through the lens of the four factors when, as here,[8] a particular activity is not included in the list of governmental activities in the TTCA, the Court finds that the *Homoky* court's conclusion that the city's operation of the golf course was a governmental function does not control the Court's determination here of whether the City acted in its governmental or proprietary capacity.

Remarkably, even after Plaintiff filed its Response, which extensively addressed the *Jimmy Changas* factors, the City chose not to address those factors in its Reply, standing instead

---

[7] Section 75.001 is part of the Texas Recreational Use Statute, which governs the liability of a city as a premises owner if a plaintiff engages in recreation on the premises. *Homoky*, 294 S.W.3d at 813.

[8] Owning or operating a golf course is not identified as a governmental function in the TTCA. *See Homoky*, 294 S.W.3d at 814 (acknowledging that "'golf course' is not among those governmental functions listed in" the TTCA).

on the *Homoky* conclusion about the golf course at issue in that case. [Doc. 20 at ¶¶ 9, 16, 20.]

The City focused on the fact that the *Jimmy Changas* court did not hold that every chapter 380

agreement involves a proprietary function. [*Id.* at ¶¶ 14, 18.]  The City argued simply that the

Texas Supreme Court noted that "it is the purpose of the underlying agreement, not simply the

fact that an agreement was made, that determines whether a proprietary or governmental function

is implicated." [*Id.* at ¶ 10.]

The City also argued that its position is supported by the discussion in the *Jimmy*

*Changas* decision of the court of appeals' decision in *CHW-Lattas Creek, L.P. v. City of Alice*,

565 S.W.3d 779 (Tex. App. 2018).  Specifically, the City argued that although the supreme court

reversed the court of appeals holding that the chapter 380 agreement in the *CHW-Lattas Creek*

case involved a governmental function, "it did *not* disagree with that court's ultimate conclusion

that the Chapter 380 agreement nevertheless involved *other* governmental functions and that the

City of Alice was therefore 'engaged in a governmental function when it entered into [the

Chapter 380 agreement] at issue in that case.'" [Doc. 20 at ¶ 19 (quoting *Jimmy Changas*, 670

S.W.3d at 502 n.4).]  A closer examination of the supreme court's discussion of *CHW-Lattas* and

that case reveals the fallacy of the City's argument here.

In *Jimmy Changas*, the city argued that the chapter 380 agreement fell into the statutory

list of governmental functions in the TTCA, which includes "community development or urban

renewal activities undertaken by municipalities and authorized under Chapters 373 and 374,

Local Government Code." *Jimmy Changas*, 670 S.W.3d at 501 (citation omitted).  While

acknowledging that the city's agreement did not fall under chapters 373 or 374, but under

chapter 380, the city relied on the court of appeals' decision in *CHW-Lattas Creek. See id.*  The

supreme court expressly disagreed with the court of appeals' stretching of the TTCA categories

to cover chapter 380 agreements relating to community development activities.  The court, however, did not find faulty the ultimate conclusion of the court of appeals that the city had engaged in a governmental function, saying,

> Even if that contract did not fall within subsection (a)(34)'s description, it concerned many different municipal functions that *may* otherwise be considered governmental, including "street construction and design," "sanitary and storm sewers," "waterworks," "parks and zoos," "civic, convention centers, or coliseums," and "recreational facilities, including but not limited to swimming pools, beaches, and marinas."

*Id.* at 502 n.4 (emphasis added) (citation omitted).

The chapter 380 agreement in *CHW-Lattas Creek* provided that the city would "construct a multi-use complex, including but not limited to an outdoor amphitheater, an Aquatic Center [as defined in the agreement] and a conference center, and w[ould] facilitate the construction of a hotel within said 40 acres." *CHW-Lattas Creek*, 565 S.W.3d at 782-83.  The *CHW-Lattas Creek* chapter 380 agreement also included functions that *may be* considered governmental under the four factors that summarize both the common law and the statutory definitions.  Notably, the ultimate ruling in the *CHW-Lattas Creek* decision was not before the supreme court; the court merely rejected the *CHW-Lattas Creek* analysis because League City had relied on the faulty holding that chapter 380 agreements fall within the governmental function of community-development activities under other chapters of the Texas Local Government Code.  Thus, the Court does not find persuasive the Texas Supreme Court's failure to overturn the conclusion in *CHW-Lattas Creek* that that particular chapter 380 agreement involved governmental functions.

Keeping in mind the party-presentation principle,[9] given the City's facial attack under Rule 12(b)(1), the Court must accept as true the allegations of the Complaint.  Those allegations

---

[9] As explained by the Sixth Circuit in *In Re Chrysler Pacifica Fire Recall Products Liability Litigation*, 143 F.4th 718, 725–26 (6th Cir. 2025) (citation modified):

must be reviewed in light of the *Jimmy Changas* factors to determine whether BBI has alleged

that the City acted in a proprietary capacity in its dealings with BBI. As it relates to immunity

and the *Jimmy Changas* factors generally, the Complaint includes the following allegations:

> 7. The City was acting in its proprietary capacity – as opposed to its governmental capacity – when it entered into the Chapter 380 Program Agreement for Economic Development Initiatives and Lease Agreement with BBI discussed below.
>
> 8. The City's decision to enter into the Chapter 380 Agreement was a discretionary act and the agreement was intended to primarily benefit the residents of the City; therefore, the City was acting on its own behalf when it entered into the agreement. Moreover, the City's act of entering into the agreement was not sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary. Hence, the doctrine of sovereign immunity does not apply here and does not deprive this Court of subject matter jurisdiction over any of the claims asserted herein. *See City of League City v. Jimmy Changas*, *Inc.*, 670 S.W.3d 494 (Tex. 2023).
>
> 9. The City therefore has no immunity from suit or liability in connection with any of the claims asserted by BBI against the City herein.

[Doc. 1 at 2.]

BBI also incorporated into the Complaint by reference the 380 Agreement, which

contains the following:

> **WHEREAS**, the CITY is authorized by . . . the Texas Constitution and Chapter 380 . . . to establish programs, including programs for making grants of public resources, to promote state or local economic development and to stimulate business and commercial activity *in Baytown*; and
>
> **WHEREAS**, the CITY finds that the PROJECT will constitute a major economic investment *for Evergreen Park*, and the CITY recognizes the positive economic impact the PROJECT will have *on the City and the surrounding community* and *voluntarily desires* to facilitate the success of the PROJECT; and

---

In our adversarial system, we follow the principle of party presentation, which means that we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. A court transcends its limited role as neutral arbiter in this system if it proceeds to act as a self-directed board of legal inquiry and decide issues that the parties never presented. Indeed, our adversarial system is designed around the premise that the parties know what is best for them and are responsible for advancing the facts and arguments entitling them to relief. That is why courts in our system may not sally forth each day looking for wrongs to right but must instead exist as passive instruments of government.

**WHEREAS**, the CITY has determined that a conditional and collateralized lease of the LAND and a separate grant of public funds to incentivize the PROJECT will (1) serve the public purposes of promoting local economic development, (ii) encourage, stimulate and enhance significant new economic investment and commercial activity *in Evergreen Park* in a controlled and responsible way, and (iii) develop or expand local and state commerce; and

. . .

**WHEREAS**, the CITY desires to enter into this AGREEMENT with DEVELOPER to implement the economic development program described herein . . . ; and

**WHEREAS**, the Parties agree the provisions of this AGREEMENT substantially advance a legitimate interest of CITY by *expanding CITY's tax base, increasing employment reducing underemployment and stimulating economic development . . . .*

[Doc. 1-1 at 1-2 (emphases added).]  These provisions of the 380 Agreement illustrate that the

*Jimmy Changas* factors lean heavily toward a conclusion that the City acted in its proprietary

capacity with BBI, and for purposes of the Dismissal Motion, they constitute sufficient

allegations that the City acted in a proprietary, not governmental, capacity.

1.  Factor One:  Discretionary Activity

The first factor, "discretionary activity," considers whether the City's "act of entering

into the contract was mandatory or discretionary." *Jimmy Changas*, 670 S.W.3d at 504.  Under

chapter 380, a municipality "'*may* establish and provide for the administration of one or more

programs . . . to promote state or local economic development and to stimulate business and

commercial activity in the municipality.'" *Id.* (quoting Tex. Loc. Gov't Code § 380.001(a)).  As

pointed out by the Texas Supreme Court, the statutory language itself does not require a

municipality "to use public funds to promote economic development or to stimulate local

business." *Id.*

The Complaint alleges – and the parties have stipulated – that they entered into the 380 Agreement. [Doc. 1 at ¶ 11; Doc. 1-1; Doc. 9 at ¶¶ 3-4; Stip. Facts at ¶¶ 15-17.]  The Complaint also includes an allegation that "[Defendant's] decision to enter into the Chapter 380 Agreement was a discretionary act." [Doc. 1 at 1 ¶ 8.]  Further, the 380 Agreement states expressly that the City "*voluntarily desires*" to engage in the project. [Doc. 1-1 at 1 (emphasis added).]

This factor, as alleged by BBI, weighs in favor of the City having acted in its proprietary capacity.

2.  Factor Two:  Primarily for the Benefit of City Residents

Concerning the second factor, the Texas Supreme Court explained:  "Under the common law, the[] [second] factor distinguishes a municipal corporation's local purpose to serve its residents from those it may perform 'as the agent of the state in furtherance of general law for the interest of the public at large.'" *Jimmy Changas*, 670 S.W.3d at 504 (citation omitted).  The chapter 380 agreement in *Jimmy Changas* stated that its purposes were to "'stimulate business and commercial activity *in the City*,' to 'contribute to the economic development *of the City* by generating employment and other economic benefits *to the City*,' 'to encourage [Jimmy Changas] to develop the [restaurant] in a manner that establishes *the area* as a regional destination,' to 'promote *local* economic development,' and to 'raise funds for *the city* budget.'" *Id.* (alteration in original).

Similarly, here, the City stated its recognition that the project:

- would have a "positive economic impact" "*on the City and the surrounding community*,"

- would "serve the public purposes of promoting *local economic development*" while encouraging, stimulating, and enhancing "significant new economic investment and commercial activity *in Evergreen Park,*[10]" and

- was to advance *the City's* legitimate interest in "*expanding CITY's tax base, increasing employment, reducing underemployment, and stimulating economic development.*"

[Doc. 1-1 at 1-2 (emphases added).]

In discussing this second factor, the *Jimmy Changas* court rejected the city's argument that it intended to benefit the state and all of its citizens because the chapter 380 agreement there, like here, confirms that the city entered into it "*primarily* for the benefit of those within the corporate limits of the municipality." *Jimmy Changas*, 670 S.W.3d at 504-04 (quoting *Wasson II*, 559 S.W.3d at 151). The 380 Agreement confirms the City's intent to have a positive impact on the City and surrounding communities. As in *Jimmy Changas*, this second factor weighs in favor of a proprietary function.

### 3. Factor Three:  Acting on the City's Own Behalf

Like the second factor, the third factor considers whether the City was acting on its own behalf or that of the state. *Id.* at 505. "This factor further distinguishes between acts a city chooses to perform 'in its private capacity' to benefit its residents from those 'sovereign' acts it is required to perform as an 'arm or agent of the state in the exercise of a strictly governmental function solely for the public benefit.'" *Id.* (citation omitted). The Texas Supreme Court explained in rejecting the city's argument that its intent was for state-wide economic improvements:

---

[10] Evergreen Park is the public park owned by the City for which BBI and the City contracted for the golf course to be built and operated on the site of a previous municipal golf course. [Doc. 1-1 at 1.]

We have recognized that when the first and second factors both indicate that a city entered into a contract as a proprietary function – that is, it entered into the contract as a matter of its own discretion and did so primarily to benefit its own residents – then the city was likely acting on its own behalf, at least absent some clear indication to the contrary. *See Wasson II*, 559 S.W.3d at 152. Nevertheless, even when a city exercises its own discretion to enter a contract, it may be acting on the State's behalf when, for example, the State provides funding or other support for the city's efforts. *See, e.g., Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 706 (Tex. 2019) (holding that the third factor weighed towards governmental function because the State provided most of the necessary funding).

*Id*.

Here, the Complaint alleges that the 380 Agreement "was intended to primarily benefit the residents of the City; therefore, the City was acting on its own behalf when it entered into the agreement." [Doc. 1 at 1 ¶ 8.]  Plaintiff also alleges the following:

12.  The Chapter 380 Agreement and the Lease Agreement envisioned BBI and its affiliate entities not simply redeveloping a golf course but, instead, creating a true community-gathering experience for the citizens of the City of Baytown and beyond which would serve as a catalyst for the kind of commercial development growth envisioned by the City's leadership. Toward that end, BBI associated one of the country's top golf architects to design a golf course which incorporated the unique, patent-pending double loop "T-36" golf course design created by BBI's principals which resulted in a United States Golf Associated-rated 18-hole golf course which utilized half the acreage required by traditional golf course designs, making the course more environmentally-friendly and thereby unlocking the remaining acreage for further commercial, hospitality or multi-family residential development.

. . . .

17. With and following the opening of the golf course, BBI continued to demonstrate its commitment to and achievement of the objectives which underlied the City's decision to enter into the Chapter 380 Agreement with BBI. Indeed, through BBI's efforts, by that date T36 at Baytown opened, BBI had already doubled the value of the land which it had leased from the City. Moreover, BBI had facilitated meaningful and seemingly productive discussions on the City's behalf between City officials and Fox Sports (owner of the United States Football League) to discuss bringing the Houston Roughnecks USFL franchise to Baytown as well as with Alamo Drafthouse to discuss bringing one of its cinemas to Baytown.

18.  The City not only acknowledged BBI's role in successfully furthering the City's economic development, it expanded BBI's role when, in February of 2024,

the Baytown City Council voted 7-0 to proceed forward with Project Vector - a strategic initiative designed to unlock the untapped potential of the City's south side by creating a hotel and a mixed-use project on land adjacent to the golf course - all with BBI as the developer of these tracts of land.

[*Id.* at 4-5.]  These allegations point to the City's intent to improve economic and leisure opportunities for its citizens, which implicates the third factor.

Further, although the 380 Agreement states that the Texas Constitution and chapter 380 authorize programs to promote "state or local economic development," the City also pointed in the same paragraph to its authority "to stimulate business and commercial activity *in Baytown*." [Doc. 1-1 at 1 (emphasis added).]  The 380 Agreement repeatedly references the positive "local economic impact" "on the City," "the surrounding community," and "Evergreen Park."[11] [*Id.* at 1-2.]  The Complaint's allegations together with the 380 Agreement itself satisfactorily plead the third factor under *Jimmy Changas*.

4.   Factor Four:  Relation to a Governmental Function

Under *Jimmy Changas*, the "final factor considers 'whether the city's act of entering into the [contract] was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.'" *Jimmy Changas*, 670 S.W.3d at 505 (quoting *Wasson II*, 559 S.W.3d at 150).  Importantly, the court recognized that "not all activities 'associated' with a governmental function are 'governmental,'" and "[t]he fact that a city's proprietary action 'touches upon' a governmental function is insufficient to render the proprietary action governmental." *Id.* (quoting *Wasson II*, 559 S.W.3d at 152–53).  A city's proprietary action might be treated as governmental "only if it is essential to the city's governmental actions." *Id.* (quoting *Wasson II*, 559 S.W.3d at 153).

_____

[11] The occasional inclusion of "the state" in the City's goals as stated in the 380 Agreement does not override the specific statements concerning the City's goals for the local community, especially for a facial attack under Rule 12(b)(1).

Though "[l]ocal and economic development and job creation are undoubtedly 'public

purposes,' . . . entities engaged in economic-development programs do not provide services that

are 'essential' to the functions of the government." *Id.* at 506 (quoting *Rosenberg Dev. Corp. v.*

*Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750-51 (Tex. 2019)).  Because "all economic-

development activities are 'local,' and circumstances could conceivably exist in which the State

*requires* a municipality to engage in such activities as an arm of the State for the greater benefit

of the general public," governmental economic development activities can constitute a

governmental function. *Id*.

Here, however, paragraphs 12, 17, and 18 of the Complaint suffice to survive

Defendant's facial attack concerning this fourth factor under *Jimmy Changas*.  The Court finds

that Plaintiff adequately alleged in its Complaint (with the incorporated 380 Agreement) that the

City "made the discretionary decision to enter into . . . a contract" of the kind that the state

authorizes for cities to promote their local economies. *Id.*  As in *Jimmy Changas*, "the contract

itself confirms that [the City] did so by choice and primarily to benefit the City and its residents."

*Id.*

In summary, the Court finds that the Complaint sufficiently pleaded allegations that the

City's actions of entering into the 380 Agreement and Lease served proprietary rather than

governmental functions, meaning that BBI's allegations adequately assert that the City is not

clothed with sovereign immunity in this case.   This conclusion applies not only to Plaintiff's

contract claim[12] but also to the fraud, unjust-enrichment, and declaratory-judgment[13] claims

because immunity applies only when the City acted in its governmental capacity, and Plaintiff

adequately alleged that the City was acting in its proprietary capacity. *Wasson I*, 489 S.W.3d at

434; *Horn*, 489 S.W.3d at 522.

## B. <u>Failure to State a Claim Under Rule 12(b)(6)</u>

Rule 12(b)(6) requires dismissal for "failure to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6).  Under Rule 8(a), "[a] pleading that states a claim for relief

must contain:  (1) a short and plain statement of the grounds for the court's jurisdiction . . . ; (2) a

short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a

demand for the relief sought, which may include relief in the alternative or different types of

relief." Fed. R. Civ. P. 8(a) (applicable to this adversary proceeding through Federal Rule of

Bankruptcy Procedure 7008).  "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 570).  The complaint need not contain "detailed factual allegations[; however,] a plaintiff's

obligation to provide the grounds of his 'entitle[ment] to relief' requires more than labels and

---

[12] Because Plaintiff has alleged that the City acted in its proprietary capacity, the Court rejects the City's argument
that chapter 271 of the Texas Local Government Code restricts the damages that Plaintiff may seek against the City.
If the City was acting in its proprietary capacity, chapter 271 (which waives immunity for certain contracts) does not
apply. *Wasson I*, 489 S.W.3d at 438 ("[T]he dichotomy is applied to determine whether there is immunity *in the first
instance*, while Chapter 271 acts to waive *already existing* immunity in certain circumstances.").  Nothing more needs
to be said about the City's arguments under chapter 271. The same is true for Plaintiff's argument that the City's
immunity from liability is not waived by 11 U.S.C. § 106(b).  Because Plaintiff adequately alleged that the City is not
entitled to immunity because it acted in a proprietary capacity, the Court need not reach the question of whether §
106(b) provides an alternative waiver of sovereign immunity.  Additionally, the City argued for dismissal of the
contract claim only under Rule 12(b)(1) and did not argue that the breach-of-contract claim fails under Rule 12(b)(6).
Nonetheless, the Court finds that the allegations suffice to state a plausible contract claim in satisfaction of the
*Iqbal/Twombly* standard to preclude dismissal under Rule 12(b)(6). [*See* Doc. 1 at ¶¶ 11, 21-27, 29-31, 38.]

[13] Concerning Plaintiff's request for a declaratory judgment, the City argued only that sovereign immunity is not
waived for such a claim.

conclusions, and a formulaic recitation of a cause of action's elements will not do.  Factual

allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550

U.S. at 545.

Although a complaint containing "'either direct or inferential allegations respecting all

material elements' necessary for recovery under a viable legal theory" will survive a Rule

12(b)(6) motion, the court "need not accept as true legal conclusions or unwarranted factual

inferences, and conclusory allegations or legal conclusions masquerading as factual allegations

will not suffice." *Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013)

(quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010)).

> A claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a defendant has acted
> unlawfully.  Where a complaint pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line between possibility and plausibility
> of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57).

When deciding whether to dismiss under Rule 12(b)(6), the court must "construe the

complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all

reasonable inferences in favor of the plaintiff." *Thomas v. Montgomery*, 140 F.4th 335, 339 (6th

Cir. 2025) (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d

452, 456 (6th Cir. 2011)).  The Court also must "take care to read the complaint's allegations 'as

a whole.'" *Sturgill v. Am. Red Cross*, 114 F.4th 803, 807 (6th Cir. 2024) (quoting *Matrixx

Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011)).

The City argued that Plaintiff's Complaint fails to state a claim for fraud and for unjust

enrichment.  The City also argued that Plaintiff failed to state a claim under the Lanham Act,

which is referenced in the Complaint's prayer for relief, and Plaintiff acknowledges that it did not state a claim under the Lanham Act. [Doc. 19 at ¶ 2.d.]

    1. <u>Plaintiff's Complaint sufficiently pleads fraud with particularity.</u>

The City seeks dismissal of Plaintiff's fraud claim for failure to "state with particularity the circumstances constituting fraud or mistake." [Doc. 10 at ¶ 31 (quoting Fed. R. Civ. P. 9(b)).] The City's argument is succinctly stated as follows:

> Plaintiff fails on every front to plead fraud with particularity.  Plaintiff fails to even identify a specific false statement made by the City let alone the time, place or content of any such statement.  Plaintiff's fraud count is nothing more than a repackaging of the allegations underpinning its breach-of-contract claim, and a conclusory recital of the elements of common law fraud.

[*Id.* at ¶ 32.[14]]

Under Federal Rule of Civil Procedure 9(b), which is applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7009, "a party must state with particularity the circumstances constituting fraud or mistake."  However, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (citation omitted).  Under Sixth Circuit authority, the "heightened pleading requirement for claims alleging fraud . . . must specify the who, what, when, where, and how of the alleged [fraud]." *Smith v Gen. Motors LLC*, 988 F.3d 873, 883 (6th Cir. 2021) (citation modified).  Accordingly, courts analyze the adequacy of the pleading "under the *Twombly/Iqbal* framework" and will find Rule 9(b) satisfied if the plaintiff alleges the following:  "(1) the time, place, and content of the alleged [fraud], (2) the fraudulent

---

[14] The City did not address in its Reply any of Plaintiff's arguments in opposition to the City's Rule 9(b) argument. [*See* Doc. 20.]

scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Id*. (citation

modified).

The Texas Supreme Court has summarized the necessary elements for common-law

fraud:

> To prevail on a fraud claim, a plaintiff must show: (1) the defendant "made a
> material representation that was false"; (2) the defendant "knew the representation
> was false or made it recklessly as a positive assertion without any knowledge of its
> truth;" (3) the defendant intended to induce the plaintiff to act upon the
> representation; and (4) the plaintiff actually and justifiably relied upon the
> representation and suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut.
> Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (citing *Trenholm v. Ratcliff*, 646
> S.W.2d 927, 930 (Tex. 1983)). The fourth element has two requirements: the
> plaintiff must show that it actually relied on the defendant's representation and,
> also, that such reliance was justifiable. *Grant Thornton LLP v. Prospect High
> Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018).

Texas courts have described fraud as consisting of "both active misrepresentation and passive

silence" because "[a]t common law, the word 'fraud' refers to an act, omission, or concealment

in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to

another to the taking of an undue and unconscientious advantage." *Vela v. Marywood*, 17 S.W.3d

750, 760 (Tex. App. 2000) (citations omitted); *see also Am. Tobacco Co v. Grinnell*, 951 S.W.2d

420, 436 (Tex. 1997) (stating "when circumstances impose upon a party a duty to speak and the

party remains silent, the silence itself can be a false representation" if the allegedly defrauded

party "reasonably relied on the silence to his detriment").

The Court finds that the Complaint includes the following allegations relating to

common-law fraud:

> 21. BBI did not look to or request from the City any of the additional funding
> needed and, instead, pursued an avenue granted to BBI under the Lease Agreement;
> namely, seeking the necessary bridge funding from an entity which would qualify
> as a "Tenant Affiliate" under §10.1.2 of the Lease Agreement. Pursuant to §§ 10.1.1

and 10.1.2 of the Lease Agreement, BBI was permitted to transfer part of BBI's leasehold interest in the property to a qualifying Tenant Affiliate with notice to the City in which case, in the event the City's consent to the transfer was required, the City had obligated itself in the Lease Agreement not to unreasonably withhold its consent.

22. Toward that end, BBI negotiated and effectively had secured terms for a sufficient line of credit from a third-party lending source which would qualify as a Tenant Affiliate under the Lease Agreement. Moreover, as BBI was in the process of negotiating the terms of this third-party bridge financing, BBI disclosed its efforts to the City and demonstrated to the City that this funding source would provide adequate finding to meet the ongoing needs of the project. In response, the City did nothing to discourage BBI from pursuing and securing this third-party bridge financing; nor did the City communicate to BBI anything to suggest that the City would not consent to the third-party becoming a Tenant Affiliate. In reliance upon the City's acts and conduct in this regard, BBI channeled its efforts exclusively toward securing this avenue of third-party financing even as Troon declared BBI to be in default of its obligations under the Management Agreement and threatened to cease providing services at the golf course.

23. As BBI's negotiations with the third-party funding source successfully reached their end stage, the third-party requested that BBI obtain from the City a standard landlord waiver and written affirmation that the third-party in fact met the definition of a Tenant Affiliate under the Lease Agreement.

24. Notwithstanding its contractual obligation under the Lease Agreement not to unreasonably withhold consent to the third-party financing arrangement BBI had successfully negotiated, the City refused to provide the requested standard landlord waiver and written affirmation that the third-party in fact met the definition of a Tenant Affiliate. Instead, the City: (1) sent BBI written notice that the City was alleging BBI to be in default under the Chapter 380 Agreement and the Lease Agreement, (2) changed the locks at the golf course to prevent BBI access to the course and the ability to continue to oversee operations there, (3) instructed Troon to cease depositing the golf course's revenues into BBI's bank account and to divert the revenue into a separate bank account to which BBI had no access, and (4) threatened to terminate BBI's right of possession to the property. Moreover, the City intentionally published an "Important Update" on its official governmental website stating that BBI had defaulted on its contractual obligations, a false and defamatory publication which, in turn, was republished by multiple City of Baytown Facebook accounts and which has resulted in substantial damage to the T-36 brand.

25. As a result of the City's wrongful conduct in this regard, the third-party withdrew as BBI's bridge funding source, leaving BBI without any viable options other than to initiate a voluntary Chapter 11 bankruptcy proceeding to protect its interests and to pursue its lawful rights and remedies.

. . . .

33. As a result of the aforementioned conduct described above, by commission, omission and/or nondisclosure, the City made false representations with the intent that BBI actually rely on them. BBI justifiably relied on these representations to its detriment which proximately caused substantial harm to BBI. The City had actual knowledge of the wrongfulness of its conduct when making the subject representations to BBI and, despite that knowledge, intentionally pursued that course of conduct, resulting in direct and special damages to BBI comprised of the loss of the net profits it would have realized over the term of the Lease Agreement, an amount reasonably estimated to be in the range of $15 million - $20 million for the golf and golf-related operations and another $30 million - $35 million for the additional commercial development opportunities generated by the Lease Agreement, for which BBI herein seeks recovery.

34. Moreover, BBI believes that its damages resulted from the City's actual fraud or malice, thereby entitling BBI to recover exemplary damages pursuant to §41.003 of the Texas Civil Practice & Remedies Code.

[Doc. 1 at 6-10.]

Examining these allegations under the *Iqbal*/*Twombly* standard and accepting them as true for purposes of the Dismissal Motion, the Court finds that Plaintiff has pleaded facts concerning "(1) the time, place, and content of the alleged [fraud], (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Smith*, 988 F.3d at 883 (citation modified). The allegations, construed in the light most favorable to Plaintiff and taken as true in the current procedural posture, state the necessary elements for common-law fraud under Texas law – that the City's silence was a material representation that was false with the intent for Plaintiff to rely on such silence and that Plaintiff actually and justifiably relied on the City's representation by omission and suffered injury as a result.

Thus, the City's request for dismissal of the common-law fraud claim for failure to plead with particularity under Rule 9(b) must be denied.

2. <u>Plaintiff's Complaint sufficiently pleads unjust enrichment</u>.

The City argues that "[u]njust enrichment on its own cannot support a waiver of governmental immunity." [Doc. 10 at ¶ 33.]  Because Plaintiff sufficiently alleged that the City is not entitled to sovereign immunity, the Court must reject this argument as it relates to unjust enrichment.

The City also argues that the existence of an express contract bars recovery under a quasi-contract theory like unjust enrichment. [*Id.* at ¶ 35.]  Although the Complaint does not expressly state that the unjust-enrichment claim is asserted as an alternative to the contract claim [*see* Doc. 1 at ¶ 35], Plaintiff acknowledges that it may not recover the same damages for breach of contract and unjust enrichment, but that it may plead the two claims in the alternative, which is what it intended. [Doc. 19 at ¶ 46.]  The City did not address the propriety of alternative claims in its Reply. [*See* Doc. 20.]

In Texas, unjust enrichment is not an independent cause of action but is a "claimed entitlement to . . . equitable relief" "in the alternative to [a plaintiff's] legal causes of action." *Frolamo, LLC v. Ortega*, No. 13-23-00210-CV, 2025 WL 1387070, at *22 (Tex. App. May 13, 2025) (quoting *Brooks v. Wycough*, No. 12-24-00186-CV, 2025 WL 51842, at *10 (Tex. App. Jan. 8, 2025)).  "[R]ecovery under an equitable theory is generally inconsistent with [an] express agreement." *GRCDallasHomes LLC v. Caldwell*, 619 S.W.3d 301, 308 (Tex. App. 2021) (citations omitted); *see Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory.").  Thus, the "affirmative defense of express contract" must be raised "when it is not clear that as a matter of law the contract's terms cover the subject of an equitable claim." *GRCDallasHomes*, 619 S.W.3d at 308.

The existence of an affirmative defense, however, does not create a basis for dismissal under Rule 12(b)(6).

The City "made no argument . . . regarding [Plaintiff]'s entitlement to equitable relief . . . based on the facts of the case." *Brooks*, 2025 WL 51842, at *10.  The Court finds that the Complaint, regardless of Plaintiff's failure to use the term "alternative" in paragraph 35, "put [the City] on fair notice that, in the alternative to [its] legal causes of action, [Plaintiff] claimed entitlement to . . . equitable relief." *Id.*  Thus, the City's request for dismissal under Rule 12(b)(6) of BBI's claim for unjust enrichment must be denied.

## II.  CONCLUSION

In summary, the Court finds that the Complaint sufficiently alleged facts that Defendant is not entitled to immunity from suit or liability because its actions were proprietary in nature, thus sufficiently alleging that this Court has subject-matter jurisdiction over Plaintiff's claims for breach of contract, fraud, unjust enrichment, and declaratory relief.  The Court also finds that the Complaint sufficiently pleads facts with particularity to plausibly state a cause of action for common-law fraud.  Finally, the Court finds that Plaintiff's Complaint adequately asserts a claim for unjust enrichment as an alternative to its contract claim.  Accordingly, Defendant's Dismissal Motion will be denied.

An order consistent with this memorandum will be entered.

FILED:  March 17, 2026

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE